**The below described is SIGNED.**

Dated: March 31, 2015



**R. KIMBALL MOSIER
U.S. Bankruptcy Judge**



IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>C.W. MINING COMPANY, *dba* Co-Op Mining Company,<br><br>Debtor. | Bankruptcy Number: 08-20105<br><br>Chapter 11 |
| GARY E. JUBBER, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>DEFENDANTS RE C.W. MINING COMPANY COAL PROCEEDS,<br><br>Defendant. | Miscellaneous Adversary Proceeding No. 11-08002<br><br>[Consolidated Proceedings Regarding C.W. Mining Company Coal Proceeds Issues]<br><br>Judge R. Kimball Mosier |

**MEMORANDUM DECISION**

The Court is addressing two matters in this Memorandum Decision. The first is the Motion for Partial Summary Judgment with Respect to Accounts (Motion) filed by Gary E. Jubber, the Chapter 11 Trustee (Trustee) of the bankruptcy estate of C.W. Mining and Plaintiff in this consolidated adversary proceeding (Consolidated Proceeding). The second is the Court's

consideration of summary judgment pursuant to Fed. R. Civ. P. 56(f)(3) (Rule 56(f)(3) Order). The Trustee's Motion seeks a determination that (1) the assignment of the Debtor's Accounts[1] is subject to the Uniform Commercial Code (UCC); (2) the Debtor's Accounts are property of C.W. Mining or the bankruptcy estate; and (3) any security interest in the Debtor's Accounts is avoided. The Court conducted a hearing on the Motion on October 16, 2014 and took the matter under advisement, and on November 4, 2014, the Court issued a tentative ruling on the Motion. On November 14, 2014, the Court issued its Rule 56(f)(3) Order, which (1) identified for the parties what issues had been determined previously; (2) identified what issues the Court believed were not material to this consolidated adversary proceeding in light of those determinations; (3) invited the parties to brief the issues the Court had identified; and (4) gave notice of the Court's intent to consider summary judgment on all issues in this consolidated adversary proceeding. The Court conducted a hearing on the Rule 56(f)(3) Order on January 6, 2015.

After carefully considering the Trustee's Motion, the responses thereto, and the parties' briefs on the Rule 56(f)(3) Order, and after conducting its own independent research of applicable law, the Court hereby issues the following Memorandum Decision.

## I. JURISDICTION

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) & (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is appropriate under 28 U.S.C. § 1409.

---

[1] "Debtor's Accounts" is a specifically defined term in the Motion. The Court will address this definition *infra* pp. 8–9.

## II.  PROCEDURAL BACKGROUND

The Court ordered the consolidation of various adversary proceedings (Consolidation Order) to address common questions of law and fact related to the following issues: (1) whether the Coal and Coal Proceeds[2] were property of C.W. Mining or property of the bankruptcy estate; (2) whether the Coal and Coal Proceeds were assigned to another party; (3) whether the Coal and Coal Proceeds were subject to a security interest of any defendants in this consolidated adversary proceeding; and (4) whether such security interests may be avoided by the Trustee pursuant to 11 U.S.C. § 544.[3]

## III.  FINDINGS OF FACT

In 1997, C.W. Mining Company *dba* Co-Op Mining Company (Debtor) entered into a Coal Operating Agreement with C.O.P. Coal Development Company.  Under the Coal Operating Agreement, the Debtor was granted "the exclusive authority to operate and control [tracts of land including the Bear Canyon Mine] . . . for the term of 25 years, beginning March 1, 1997, and extending to February 28, 2022."[4]  On March 27, 2001, the Debtor and Standard Industries, Inc. (Standard) entered into the Advance Payment Agreement under which Standard agreed that it may make advance payments to the Debtor against future coal production.  Paragraph 3 of the Advance Payment Agreement states:

---

[2] The Consolidation Order, entered as Docket No. 1 in this Consolidated Proceeding, defines "Coal" as "all coal mined by C.W. Mining from the Bear Canyon Mine (Mine), when C.W. Mining was in possession of the Mine." It further defines "Coal Proceeds" as "proceeds from the sale of the Coal."

[3] All subsequent statutory references are to Title 11 of the United States Code unless otherwise indicated.

[4] Declaration of Charles Reynolds, Ex. 1, Doc. No. 46, at 13, Adv. No. 09-02047.

> Standard may from time to time make advance payments to or on behalf of [the Debtor] for the purchase price of coal not yet mined, as the parties may mutually agree. Any such payments shall in no way obligate Standard to make any additional payment. Standard's payments to [the Debtor] are advance payments for purchases of coal not yet mined, for which Standard shall have full legal and equitable title to the coal as it is mined by [the Debtor], and shall not be construed as a mere loan to [the Debtor].[5]

Paragraph 13 of the Advance Payment Agreement provides that the Debtor grants Standard a security interest in all of the Debtor's personal property "now owned or hereafter acquired, and all profits and proceeds from the appreciation, sale, use, or disposition of [the Debtor's] property."[6]

Six years later on March 5, 2007, the Debtor and Standard entered into the Coal Sales Agency Agreement (Agency Agreement). The Agency Agreement appoints Standard as the Debtor's exclusive sales agent for coal mined during the term of the Agency Agreement.[7] Paragraph 3 of the Agency Agreement provides:

> [The Debtor] shall at no time acquire legal or equitable title to the coal mined by [the Debtor]. All legal and equitable title to the coal produced by [the Debtor] shall transfer from [the Debtor's] lessor to [Standard] immediately upon severance of the coal from its seam, thereby absolutely and irrevocably divesting [the Debtor's] lessor of title and simultaneously vesting [Standard] with all right, title and interest in and to the coal, subject to the rights of [the Debtor's] customers under the terms of their coal sales contracts, including the customers' rights to take possession of the coal and have title to the coal transferred to them. [Standard's] title to the coal shall automatically transfer from [Standard] to [the Debtor's] customers upon transfer of possession of the coal to the customers, whether by loading the coal on customers' rail cars or trucks, or as otherwise provided for in the customers' coal sales contracts.[8]

---

[5] Trustee's Motion for Partial Summary Judgment with Respect to Accounts, Ex. A, Doc. No. 362, at 17, Adv. No. 11-08002. All subsequent references to documents are to those filed in Adv. No. 11-08002 unless otherwise indicated.

[6] *Id.* at 18.

[7] Declaration of Charles Reynolds, Ex. 1, Doc. No. 190-1, at 6.

[8] *Id.*

Paragraphs 8 and 9 provide:

> [Standard] may from time to time loan money to [the Debtor], or advance money to or for the benefit of or on the account of [the Debtor], for which [the Debtor] shall pay [Standard] according to the terms of any agreement for the loan or advancement of such monies.
>
> Unless otherwise set by a promissory note or other agreement, any indebtedness of [the Debtor] to Debtor under this Agreement shall accrue interest at twelve (12) percent per annum.[9]

Paragraph 10 of the Agency Agreement reads as follows:

> [The Debtor] irrevocably assigns, transfers, and conveys to [Standard] all of [the Debtor's] right, title and interest to all amounts now due or to become due to [the Debtor], including but not limited to all proceeds from the sale of coal payable to [the Debtor], under any and all present and future contracts between [the Debtor] and its customers, together with all amounts payable or to become payable to [the Debtor] under any renewal, amendment, extension, modification, replacement, or substitution of such contracts. This assignment is given as an absolute assignment, transfer and conveyance, and not as a mere security interest. [The Debtor] shall indemnify and hold [Standard] harmless, and at [Standard's] request defend [Standard] at [the Debtor's] expense, from any and all claims by third parties to any interest in the assigned coal sale proceeds and any other amounts assigned, including the payment of all court costs, reasonable attorney fees, consequential and incidental damages, and other expenses of any nature whatever, that [Standard] may incur in connection with any such claims.[10]

The Agency Agreement further provides that Standard will invoice the Debtor's customers (Coal Purchasers), and the Debtor "shall notify and require its customers to make any payments of amounts assigned to [Standard] directly to [Standard], or as [Standard] shall otherwise direct."[11] In addition,

---

[9] *Id.* at 7.

[10] *Id.* Various provisions of the Agency Agreement were amended on December 20, 2007, and the amendment was "retroactive to the original effective date of the [Agency Agreement]." *See id.* at 9.

[11] *Id.* at 7.

5

the Agency Agreement makes Standard responsible "for the collection from customers of such assigned payments."[12]

On July 23, 2002, the Debtor and Tennessee Valley Authority (TVA) entered into a contract under which the Debtor contracted to sell coal to TVA (TVA Agreement).[13] Standard is not a party to the TVA Agreement and has no obligations thereunder. The coal TVA purchased was purchased pursuant to the TVA Agreement and not pursuant to an agreement or contract with Standard. Approximately four years later, the Debtor and TVA executed a Contract Supplement to the TVA Agreement, dated April 24, 2006.[14] On August 8, 2002, the Debtor and Standard entered into a contract whereby the Debtor assigned to Standard all of its "right, title and interest in and to the proceeds of [the TVA Agreement]" (TVA Assignment).[15] The Debtor did not assign the TVA Agreement to Standard; it only assigned its right to receive payment under the TVA Agreement to Standard.

On November 28, 2007, the Debtor entered into two contracts related to the sale of coal to UtahAmerican Energy, Inc. (UEI). One was designated as the Spot Coal Supply Agreement (UEI Agreement), under which the Debtor contracted to sell coal to UEI.[16] Under the UEI Agreement as

---

[12] *Id.*

[13] Declaration of Charles Reynolds, Ex. 4, Doc. No. 190-4, at 30.

[14] *Id.* at 61.

[15] Trustee's Motion for Partial Summary Judgment with Respect to Accounts, Ex. B, Doc. No. 362, at 22.

[16] Complaint, Ex. A, Doc. No. 1-1, Adv. No. 09-02047.

amended, it was Standard that invoiced and collected payment for the purchase of the coal.[17] The other contract, designated the Assignment of Coal Sale Contract Proceeds (UEI Assignment), was between the Debtor and Standard, under which the Debtor assigned to Standard all of its "right, title and interest to all amounts now due or to become due to [the Debtor], including but not limited to all proceeds from the sale of coal payable to [the Debtor], under that certain [UEI Agreement], between [the Debtor] as Seller and [UEI] as Buyer."[18] In the UEI Assignment, the assignment was given as an absolute assignment and "not as a mere security interest."[19] The Debtor did not assign the UEI Agreement to Standard; it only assigned its right to receive payment under the UEI Agreement to Standard.

On October 30, 2007, just a month before the execution of the UEI Agreement and the UEI Assignment, Aquila, Inc., a purchaser of coal mined at the Debtor's facility, obtained a $24,841,988 judgment against the Debtor in the United States District Court for the District of Utah. On January 8, 2008, Aquila and other petitioning creditors filed an involuntary Chapter 11 bankruptcy petition against the Debtor. The Court entered an order for relief against the Debtor on September 26, 2008. On November 13, 2008, the Court converted the Debtor's Chapter 11 bankruptcy case to one under Chapter 7, and Kenneth A. Rushton was appointed to serve as the Chapter 7 Trustee. The Court subsequently reconverted the case to one under Chapter 11 on February 6, 2014, and Gary E. Jubber was appointed to serve as the Chapter 11 Trustee.

---

[17] The UEI Agreement was amended on February 16, 2008 "to correct scrivener's errors" and to clarify this payment structure. Complaint, Ex. B, Doc. No. 1-2, Adv. No. 09-02047.

[18] Complaint, Ex. E, Doc. No. 1-5, Adv. No. 09-2047.

[19] *Id.*

The Trustee concedes for purposes of his Motion that the TVA Assignment and the UEI Assignment are authentic documents and did assign or sell the accounts created by the TVA Agreement and UEI Agreement to Standard. The parties do not dispute that as of the petition date, Standard had collected on certain of the Debtor's accounts arising from the Debtor's contracts with Coal Purchasers that had been assigned or sold to Standard, while other accounts remained unpaid.

## IV. ANALYSIS

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, the Court is required to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The parties agree, for purposes of the Motion, that there is no genuine dispute as to any material fact.

### B. The Only Coal Proceeds Identified by the Trustee Are the Accounts.

In his Motion, the Trustee equates "Debtor's Accounts" with "Coal Proceeds" as defined in the Consolidation Order. The accounts the Trustee identifies as the Debtor's Accounts are accounts arising from the invoices Standard issued to Coal Purchasers (Accounts). The Court believes that the Consolidation Order does not equate Coal Proceeds with Accounts. The Consolidation Order defines "Coal Proceeds" as "proceeds from the sale of the Coal," and Coal is further defined as "all coal mined by C.W. Mining from the Bear Canyon Mine (Mine), when C.W. Mining was in possession of the Mine." Coal Proceeds were broadly defined in the Consolidation Order because of the positions the parties asserted. The Trustee insisted he is entitled to trace the Coal and its

proceeds in whatever form they exist and asserted that any money he can trace from the sale of the Coal constitutes Coal Proceeds. Standard has consistently maintained that it purchased the Coal from C.W. Mining and, as owner of the Coal that was sold, it is entitled to the Coal Proceeds. An account arising from the sale of the Coal is a type of Coal Proceed, but is not the equivalent of Coal Proceeds. Accounts are defined in Utah Code Ann. § 70A-9a-102(2) as "a right to payment of a monetary obligation." The Consolidation Order's definition of Coal Proceeds includes accounts, as defined by the UCC.

Although the Accounts are different from Coal Proceeds, the Accounts are the only type of Coal Proceed the Trustee has identified in his Motion. Accordingly, for purposes of this ruling, the Court will limit its analysis of Coal Proceeds to Debtor's Accounts. The Court will distinguish between Accounts that remained unpaid on the petition date (Open Accounts), and Accounts that were paid prior to the petition date (Closed Accounts). The Court may refer to Open Accounts and Closed Accounts collectively as Debtor's Accounts or Accounts.

**C. Ownership of the Accounts Does Not Depend on Ownership of the Coal.**

Standard has consistently maintained that because it purchased the Coal from C.W. Mining and therefore sold *its own* coal to the Coal Purchasers, it owns the Accounts. On March 31, 2014, the Court issued a memorandum decision regarding the UEI Agreement and the UEI Assignment in Adv. No. 09-02047 (UEI Decision).[20] In the UEI Decision, the Court determined that ownership of the Accounts does not depend on ownership of the Coal and the Court adopts and incorporates that ruling here. The Accounts resulted from the Debtor's contracts with the Coal Purchasers, and the source of the coal used to fulfill the contracts does not alter the fact that the Accounts belonged to

---

[20] *Rushton v. Standard Indus., Inc. (In re C.W. Mining Co.)*, 509 B.R. 378 (Bankr. D. Utah 2014).

the Debtor. Because ownership of the Coal does not affect the determination of ownership of the Accounts,[21] the Court concludes that ownership of the Coal is no longer material to the resolution of this Consolidated Proceeding.

### D. The Assignment of the Debtor's Accounts Is Subject to the UCC.

The Trustee's first ground for partial summary judgment requests a determination that the assignment of the Debtor's Accounts is subject to the UCC. For purposes of the Trustee's Motion, the parties agree that an assignment of accounts is equivalent to a sale of accounts under Article 9 of the UCC. With certain exceptions, Article 9 of Utah's UCC applies to "a sale of accounts."[22] The Debtor's Accounts fit squarely within the UCC definition of accounts and are subject to the UCC unless an exception applies.

Standard argues that the assumed obligation exception of § 70A-9a-109(4)(f) removes the TVA Assignment from the bounds of the UCC.[23] That exception provides that Article 9 of Utah's UCC does not apply to "an assignment of a right to payment under a contract to an assignee that is also obligated to perform under the contract."[24] Standard contends that the Accounts at issue in the TVA Assignment are not subject to the UCC because the TVA Assignment obligated Standard to perform certain duties and because the course of dealing among the parties establishes that Standard, rather than the Debtor, assumed the risk of ownership of the Coal.

---

[21] As the Court has noted, the Accounts are the only type of Coal Proceed the Trustee has identified. But if other types of Coal Proceeds were identified, the Court's conclusion that ownership of the Coal is not determinative of ownership of the Accounts would apply with equal force to those other types of Coal Proceeds.
[22] Utah Code Ann. § 70A-9a-109(1)(c) (2009).
[23] Standard has made the argument in another adversary proceeding that Article 9 is also inapplicable to Accounts other than those covered by the TVA Assignment. The Court decided that issue against Standard, and Standard acknowledged that decision at the October 16 hearing.
[24] Utah Code Ann. § 70A-9a-109(4)(f) (2009).

The Court previously addressed this line of argument in the UEI Decision. The pertinent facts of that case were that the Debtor "executed a contract with UEI for the sale of coal and later assigned its right to payment under that contract to Standard but did not assign the contract."[25] In addition, Standard was not a signatory to the UEI Agreement and, pursuant to the Agency Agreement, the Debtor was "the obligated party in the event of any defaults and the duties of the coal seller run to [C.W. Mining] and not Standard."[26] Based on these facts, the Court concluded that Standard did not have any obligations to UEI, either under the UEI Agreement or the Agency Agreement. Therefore, the "assignment of the UEI Agreement proceeds to Standard is subject to perfection under Article 9 of the UCC."[27]

The foregoing analysis is directly applicable to the TVA Assignment. Standard was not a party to the TVA Agreement and is therefore not obligated to perform under it. In addition, the TVA Assignment did not assign the TVA Agreement to Standard; it only assigned the Debtor's right, title and interest in and to the *proceeds* of the TVA Agreement to Standard. For these reasons, the assumed obligation exception of § 70A-9a-109(4)(f) does not apply. As a result, the TVA Assignment, like the UEI Assignment, is subject to Article 9 of the UCC as a matter of law.

**E. The Debtor's Accounts Are Not Property of the Debtor or the Estate.**

The second request in Trustee's Motion seeks a determination that the Debtor's Accounts are property of the Debtor or the bankruptcy estate. The fact that the Debtor's Accounts are subject to the UCC is not determinative of ownership. The Trustee has conceded, for purposes of his Motion, that the Debtor sold the Accounts to Standard. Section 70A-9a-318(1) of Utah's UCC

---

[25] *In re C.W. Mining Co.*, 509 B.R. at 387.
[26] *Id.*
[27] *Id.*

11

states: "A debtor that has sold an account, chattel paper, payment intangible, or promissory note does not retain a legal or equitable interest in the collateral sold."[28]  Notwithstanding this express language, the Trustee contends that the Debtor retained a legal or equitable interest in the Accounts. The Trustee argues that even if the assignments are treated as an outright sale of the Accounts to Standard, the Debtor or the estate would still have an interest in them by virtue of § 70A-9a-318(2) of Utah's UCC. That subsection reads:

> For purposes of determining the rights of creditors of, and purchasers for value of an account or chattel paper from, a debtor that has sold an account or chattel paper, while the buyer's security interest is unperfected, the debtor is deemed to have rights and title to the account or chattel paper identical to those the debtor sold.[29]

The Trustee construes this section to conclusively establish that Standard was required to perfect its security interest in the Accounts in order to complete the sale of the Accounts. Because Standard's security interest was unperfected, the Trustee argues, the Accounts remained the Debtor's property.

The Trustee's argument suffers from two principal flaws: first, it misconstrues the language of § 318(2), and second, it reads § 318(2) in isolation rather than in the context of § 318 as a whole. Regarding the first flaw: section 318(2) does not give a debtor any rights or title to an account it has sold; it merely *deems* the debtor to hold rights and title. The operative word in § 318(2) is "deemed." Black's Law Dictionary defines the verb "deem" as "[t]o treat (something) as if (1) it were really something else, or (2) *it has qualities that it doesn't have*."[30]  By way of illustration, Black's then provides this excerpt from G.C. Thornton's *Legislative Drafting*: "'Deem' is a useful word when it is necessary to establish a legal fiction either positively by 'deeming' something to be something it

---

[28] Utah Code Ann. § 70A-9a-318(1) (2009).
[29] Utah Code Ann. § 70A-9a-318(2) (2009).
[30] Black's Law Dictionary 425 (7th ed. 1999) (emphasis added).

is not or negatively by 'deeming' something not to be something which it is."[31] Therefore, § 318(2) creates the legal fiction that a debtor holds rights and title to an account it has sold, when in fact the debtor holds no such rights and title. Moreover, the express and discrete purpose of this legal fiction is to determine the respective rights of creditors and purchasers for value, which is illustrated by the example provided under the third official comment to § 318, which reads:

> Debtor sells accounts or chattel paper to Buyer-1 and retains no interest in them. Buyer-1 does not file a financing statement. Debtor then sells the same receivables to Buyer-2. Buyer-2 files a proper financing statement. Having sold the receivables to Buyer-1, Debtor would not have any rights in the collateral so as to permit Buyer-2's security (ownership) interest to attach. Nevertheless, under this section, for purposes of determining the rights of purchasers for value from Debtor, Debtor is deemed to have the rights that Debtor sold. Accordingly, Buyer-2's security interest attaches, is perfected by the filing, and, under Section 9-322, is senior to Buyer-1's interest.[32]

This example is buttressed by the fifth official comment to § 109, which states: "Following a debtor's outright sale and transfer of ownership of a receivable, the debtor-seller retains no legal or equitable rights in the receivable that has been sold. See Section 9-318(a). This is so whether or not the buyer's security interest is perfected."[33]

Regarding the second flaw: the Trustee's interpretation ignores § 318(1), which unequivocally states that a debtor that has sold an account does not retain any legal or equitable interest in the account.[34] When § 318(1) is read together with § 318(2), the meaning of § 318 becomes clear: a debtor who sells an account retains no interest in it. Section 318(2) is not to the contrary. It only applies to resolve disputes between competing creditors or purchasers for value regarding a debtor's accounts, and it does so by creating a legal fiction—something completely

---

[31] *Id.* (quoting G.C. Thornton, Legislative Drafting 83–84 (2d ed. 1979)).
[32] Utah Code Ann. § 70A-9a-318, Uniform Commercial Code Comment 3 (West 2014).
[33] Utah Code Ann. § 70A-9a-109, Uniform Commercial Code Comment 5 (West 2014).
[34] Utah Code Ann. § 70A-9a-318(1) (2009).

13

hypothetical—that the debtor has rights and title to the account. Section 318(2) does not actually revest rights and title to accounts in the debtor. In fact, whether the Debtor retained any interest in the Accounts under § 318 is not dependent on whether Standard was perfected. Once the Debtor sold the Accounts to Standard, it had no further legal or equitable interest in the Accounts. Therefore, the Court will deny the Trustee's Motion on this point.

**F. The Trustee Can Avoid the Defendants' Security Interests in the Accounts.**

The third request in the Trustee's Motion seeks a determination that any security interest in the Debtor's Accounts is avoided. More specifically, the Trustee seeks a determination that he may avoid the transfer of the Debtor's Accounts to Standard. The Court notes that the scope of this Consolidated Proceeding is limited to addressing questions dealing with the Trustee's avoiding powers under § 544, and will limit the scope of its ruling accordingly. Additionally, because the Trustee concedes for purposes of his Motion that the Debtor did assign or sell the Accounts to Standard, for purposes of his Motion he also concedes he cannot avoid the transfer of the Accounts under Utah's Uniform Fraudulent Transfer Act,[35] so the Court is not evaluating the Trustee's avoidance claims under § 544(b). The Court is strictly looking at the Trustee's ability to avoid transfers of property to Standard that are avoidable by a hypothetical lien creditor under § 544(a)(1) or (2).[36]

This Court has previously determined, in its amended memorandum decision in Adv. No. 09-02047 (First UEI Decision),[37] that the financing statements filed by Standard, ABM, Inc., Fidelity

---

[35] Utah Code Ann. § 25-6-1 *et seq*.
[36] As a practical matter, § 544(a)(2) has no application to this Motion, and the Trustee does not rely on § 544(a)(2), so it is unnecessary to provide an extended analysis with respect to this section.
[37] *Rushton v. Standard Indus., Inc. (In re C.W. Mining Co.)*, Adv. No. 09-02047 (Bankr. D. Utah Dec. 8, 2009).

Funding Company, Security Funding, Inc., and World Enterprises (Defendants) were "seriously misleading and do not perfect any security interest in any account."[38] This portion of the First UEI Decision was affirmed on appeal,[39] and the Court adopts and incorporates it here.

The Court's analysis in the UEI Decision is applicable in this case. The UEI Decision addressed the Trustee's ability to avoid Standard's unperfected security interest in an Open Account. Because the Trustee has the rights of a judgment lien creditor under § 544(a), he had priority over Standard under § 70A-9a-317[40] and was entitled to the UEI account. The UEI Decision is applicable to all Accounts at issue in this Consolidated Proceeding.

### G. The Trustee Cannot Avoid Prepetition Transfers Under § 544(a).

The analysis is different with respect to the Closed Accounts. For purposes of his Motion, the Trustee does not dispute that the Closed Accounts were transferred to Standard prior to the petition date. Under § 544(a), the Trustee's status as a hypothetical judicial lien creditor arises when the bankruptcy petition is filed.[41] In Utah, judicial liens arise pursuant to judicial writs under Utah R. Civ. P. 64. The property subject to judicial writs is defined in Utah R. Civ. P. 64(a)(9) as "the defendant's property of any type not exempt from seizure." In order for a creditor to obtain a judicial lien, the defendant must have property subject to seizure. If the defendant has transferred an asset,

---

[38] *Id.* at 28.

[39] *See Rushton v. Standard Indus., Inc. (In re C.W. Mining Co.)*, 488 B.R. 715, 726–28 (D. Utah 2013).

[40] Utah Code Ann. § 70A-9a-317 (2009); *see also* 4 James J. White, Robert S. Summers & Robert A. Hillman, Uniform Commercial Code § 33-2 (6th ed. 2014) ("Section 9-317 subordinates an unperfected secured creditor to a lien creditor."); *Pillow v. Avco Fin. Servs. (In re Pillow)*, 8 B.R. 404, 423 (Bankr. D. Utah 1981) ("Each of the nineteenth century statutes in America allowed the avoidance of such liens, and the procedure noted above has a modern counterpart in Uniform Commercial Code, Section 9-301, and Bankruptcy Act, Section 70(c), former 11 U.S.C. Section 110(c), which subordinate unperfected security interests to lien creditors including a trustee in bankruptcy.").

[41] *Sovereign Bank v. Hepner (In re Roser)*, 613 F.3d 1240, 1243 (10th Cir. 2010).

it is no longer the defendant's property[42] and is not subject to seizure. A judgment creditor cannot obtain a judicial lien on the transferred property. Although a judicial lien creditor has priority over an unperfected security interest, a judicial lien does not enable a judgment creditor to recover transfers.[43] Because the Trustee has, as of the commencement of the case, "the rights and powers of, or may avoid any transfer of property" voidable by a judicial lien creditor, he may avoid an unperfected security interest and thereby retain property of the estate free and clear of the unperfected security interest. However, § 544(a) does not provide a basis for the Trustee to avoid a prepetition transfer of property. Consequently, whether Standard's security interest was perfected is not a material fact with respect to the Trustee's attempt to recover the prepetition payments pursuant to § 544(a)(1). Even if Standard was simply an unsecured creditor receiving payment, the payment may not be avoided under § 544(a). The material fact is that after the Accounts were paid to Standard, they were no longer the Debtor's property subject to seizure.

To reemphasize the scope of this ruling, the Court is strictly looking at the Trustee's ability, as a hypothetical judicial lien creditor, to avoid prepetition payments to Standard under § 544(a)(1). The Trustee may have a basis to avoid the transfer of the Closed Accounts under §§ 544(b), 547, or 548, but he may not avoid the prepetition payments or transfers to Standard on Closed Accounts under § 544(a)(1).

### H. Final Judgment Should Be Entered in This Consolidated Proceeding.

The Court has determined that ownership of the Coal Proceeds, including the Accounts, does not depend on ownership of the Coal. Consequently, Coal ownership need not be determined in this

---

[42] *See Rajala v. Gardner*, 709 F.3d 1031, 1039 (10th Cir. 2013) ("[F]raudulently transferred property is not part of the bankruptcy estate *until recovered*.").
[43] Clearly, a judgment creditor, like other creditors, may have a different legal basis to avoid such transfers.

Consolidated Proceeding. The Court has also determined that the Coal Proceeds are subject to the security interests of various defendants. For purposes of the Motion, the parties agree that the Accounts were sold to Standard. Regardless of whether the Accounts were sold to Standard or are only subject to Standard's security interest, the Coal Proceeds and the Accounts are subject to the perfection requirements of the UCC. Standard's and the other Defendants' interests in the Coal Proceeds and Accounts were unperfected on the petition date. Under § 544(a)(1), the Trustee can avoid these unperfected security interests and the bankruptcy estate is entitled to payments on the Open Accounts. But § 544(a)(1) does not permit the Trustee to recover the prepetition payments to Standard. Because whether the Debtor sold the Accounts to Standard or granted Standard a security interest in the Accounts does not affect the analysis with regard to the Trustee's ability to avoid security interests in the Accounts, the issue of whether the Accounts were sold or assigned, as opposed to pledged as collateral, is not a material fact in this Consolidated Proceeding.

## V. CONCLUSION

The Court concludes as a matter of law that the Accounts are subject to the UCC and will grant the Trustee's Motion on that point. For purposes of the Trustee's Motion, because the Accounts were sold to Standard, the Debtor did not retain a legal or equitable interest in the Accounts, and the Court will deny the Trustee's Motion requesting a declaratory judgment that the Accounts are property of the estate. The Court will grant the Trustee's Motion requesting declaratory judgment that the Defendants' security interests are avoided under § 544(a)(1), with the following clarification: (1) The Defendants' interests in the Open Accounts are avoided and the bankruptcy estate is entitled to all payments on the Open Accounts; (2) although the Defendants'

security interests are avoided, the Trustee is not entitled to recover the prepetition payments under § 544(a)(1). Because it is not necessary to determine Coal ownership in order to resolve the parties' interests in the Coal Proceeds, and because it is not material whether Standard bought the Accounts or only held a security interest in the Accounts, further litigation of this Consolidated Proceeding will not be beneficial.

_____END OF DOCUMENT_____

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below:

**By Electronic Service:** To all parties in this consolidated adversary proceeding entitled to receive notice through the CM/ECF system.